### HUNTINGTON et al. v. KNEELAND et al.

(Supreme Court, Appellate Division, Second Department. May 12, 1905.)

DEED AS MORTGAGE—SECURITY FOR FUTURE ADVANCES—EVIDENCE.

Evidence in an action to foreclose a mortgage *held* sufficient to sustain a finding that a deed given as a mortgage was to secure future advances as well as a present indebtedness.

On rehearing. Denied.

For former report, see 92 N. Y. Supp. 944.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and MILLER, JJ.

WOODWARD, J. The appellants move for a reargument upon the theory that this court has misapprehended the facts in this case. The rights of both parties—certainly those of the appellants—depend upon the character of a certain transfer of real estate to the plaintiff's testator in 1881. This transfer was in the form of deeds, but it is not to be doubted that it was in fact intended as a mortgage. The plaintiffs' theory is that the deeds were given to secure present and future advances, of whatever kind, while the defendants claim that the deeds were given for the purpose of securing a certain loan of $75,000, and that, this loan having subsequently been paid, the title to the land became vested in Kneeland, and was subject to the payment of debts contracted by him subsequent thereto, although none of the credit was extended because of the ownership of such property. In the year 1891, and before any material portion of the indebtedness sought to be made a charge upon this real estate had been contracted, Kneeland made and delivered his certain promissory note for $293,100.26, in which he recited that the collateral therein mentioned, including the premises involved in this litigation, was to stand as security for liabilities due or to become due, and it is upon this point that counsel fear this court has failed in comprehending the facts. In our original opinion in this case, it was said:

"Prior to the 2d day of June, 1891, advances were made aggregating, with interest, $293,100.26, which sum was embodied in a promissory note made and delivered by the defendant Kneeland to Mr. Huntington. If these advances were not made under the parol agreement, in reference to the two deeds made and delivered to the defendant Gates in 1881, then we must assume that this large sum of money was handed over to Mr. Kneeland without any other security than that of any ordinary creditor—a situation of affairs not likely to exist among prudent business men during a period of ten years, in which time no interest appears to have been paid."

In commenting upon this clause of the opinion, counsel say:

"Now, the facts are that Huntington had received collateral security of personal property to the value of about $400,000 for these loans, and all advances previous to 1890 were paid by the sales of collateral;" citing us to folios 860, 863, and 864 of the record.

While we are unable to discover how these alleged facts could possibly change the result of the reasoning in the case, if the alleged facts have no existence, it must be apparent that this court has not erred in its apprehension of the facts as they do exist, and we will therefore look to the record for the facts. Mr. Kneeland, who is contradicted by Mr. Gates upon the crucial issue in this case, testifies that he had business relations with Mr. Huntington as far back as 1878 or 1879, and that he had borrowed money of him upon collateral prior to 1881. He tells of the situation which compelled him to borrow the $75,000 which the defendants claim was the loan for which this land was pledged, and at folios 858 to 864 he says:

"After 1881 I borrowed further from Mr. Huntington. And immediately after 1881, and some years after, taking up of loans and paying off old loans and making new loans were almost continuous. For the years 1882, '83, '84, and 1885 I don't think the loans ever ran any higher than they were in 1881. I don't think they did. They might have been one or two hundred thousand dollars. * * * I did not get out of the elevated railroad for several years after the $75,000 transaction. I bought the Clover Leaf the last day of December, 1885. At that time the loans had run very low—I think about $33,000. That was on the land. All the other securities were taken up. * * * I had taken up all the rest of the loans. So I think my indebtedness to Mr. Huntington was about $33,000. That is the minimum. * * * I think that was the minimum of my loan. That was about 1885. About that time I bought the Clover Leaf. * * * After I commenced to build the Clover Leaf Railroad I had occasion to borrow further from Mr. Huntington later on in the year. * * * I did not borrow much money of Mr. Huntington until probably in 1887. I commenced to increase the loans about 1887 or early in 1888."

Where is the evidence that "all advances previous to 1890 were paid by the sales of collateral"? The evidence is that the indebtedness was paid down to about $33,000 in 1885, and that in 1887 or 1888 these loans were increased, and that in 1891 Mr. Kneeland acknowledged an indebtedness to Mr. Huntington of $293,100.26, and included in the note given for this amount a recital that the lands involved in this litigation should stand as security for this indebtedness, in entire harmony with the agreement which Mr. Gates testifies was made—that the premises should stand as security for present and future advances. It is true, of course, that there were other collaterals involved in this transaction, but it is apparent from the evidence that they were not adequate security for the loans which Mr. Huntington made from time to time to Mr. Kneeland. The latter says that the premises deed to Mr. Huntington or his representative in 1881 was intended as security only for the $75,000 loan, but Mr. Gates says that the condition was that the lands should stand as a continuing security for loans; and the fact that the lands far exceeded in value the $75,000 loan, and that Mr. Huntington appears to have been continuously supplying Mr. Kneeland with money, gives great force to the plaintiffs' theory. Mr.

Kneeland testifies that he asked Mr. Huntington to take this security, rather than stocks which he held, because the real estate was a dead asset at that time; and it is not at all unlikely, therefore, that he would be willing to mortgage the entire property as a general security, leaving him free to use his active assets for emergencies such as men engaged in speculative enterprises are constantly called upon to confront. There is some negative testimony brought out on cross-examination of Charles Babbidge, who had charge of Mr. Huntington's books from 1896, showing only some small entries in an account between Mr. Huntington and Mr. Kneeland in 1889, but it is far from conclusive that there was no indebtedness existing at that time. Mr. Kneeland, who appears friendly to the defendants, does not say that he was out of debt at any time. He says his minimum indebtedness to Mr. Huntington was in 1885, at which time it was about $33,000, and that in 1887 or 1888 he began to increase this indebtedness, while his own note in evidence shows that he owed nearly $300,000 in 1891.

After a careful review of the case, aided by the suggestions of counsel, we are persuaded that there was no misapprehension of any material fact in this case, and that we have not failed to give to each fact its proper weight in determining the appeal. There is positive testimony in the case, from a witness who appears to be disinterested, that the deeds given in 1881 were intended as a mortgage and to stand as security for future advances, and all of the conduct of the parties subsequent to that time is in entire harmony with that theory of the case. This is disputed by Mr. Kneeland, but the learned court at the trial has found the facts against the defendants, and we are of opinion that the evidence fully supports the findings.

The motion should be denied.

HIRSCHBERG, P. J., and JENKS and MILLER, JJ., concur. BARTLETT, J., taking no part.